MARY E. FRITZ, as Administratrix, etc., of JOHN A. FRITZ, Deceased, Respondent, *v.* THE SMITH-WORTHINGTON COMPANY, Appellant.

First Department, July 11, 1918.

**Principal and agent — contract employing traveling salesman construed — right to commissions on sales made in place where employer's business is located — evidence failing to establish that plaintiff was procuring cause of sale.**

Where a contract employed the plaintiff as a traveling salesman in the State of Pennsylvania and the western part of this State " and perhaps elsewhere, as may be hereafter agreed upon," and provided for a commission on sales made by him, he became entitled to commissions on orders procured by him within the city of New York outside of his employer's store, although the contract further provided that when the plaintiff was not traveling he was to spend as much time as possible in the store of his employer which was located in said city.

Evidence in an action to recover commissions on alleged sales made by the plaintiff for his employer examined, and *held*, to fail to establish that he was the procuring cause of certain sales and that a finding to the contrary was against the weight of evidence.

APPEAL by the defendant, The Smith-Worthington Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 19th day of January, 1918, upon the verdict of a jury, and also from an order entered in said clerk's office on the 22d day of January, 1918, denying defendant's motion for a new trial made upon the minutes.

*Austen G. Fox* of counsel [*Hector W. Thomas* with him on the brief; *Thomas & Houghton*, attorneys], for the appellant.

*Clarence McMillan*, for the respondent.

SHEARN, J.:

This action was brought to recover commissions on the sale of goods. The deceased plaintiff, John A. Fritz, was employed by the defendant under the following contract:

" *June* 12, 1913.

" Mr. JOHN A. FRITZ,

    " New York, N. Y. ·

" DEAR SIR.— This is to advise you that we accept your proposition to go to work for us as travelling salesman in Pennsylvania and western New York State, and perhaps elsewhere, as may be hereafter agreed upon.

" Compensation to be at the rate of $1,200.00 (Twelve Hundred Dollars) per year for selling a total of $40,000.00 worth of goods to your customers, and 5% commission on total sales above $40,000.00. All to be figured from our ledger.

" You are to spend a good portion of your time travelling, and when you are not travelling, as much time as possible here in the store.

" We are to pay your actual travelling expenses, and your time to commence on June 9, 1913.

" This contract depends on the mutual satisfaction of both parties, and may be terminated by either party on thirty days notice.          Yours truly,

    " THE SMITH-WORTHINGTON COMPANY,

        " T. MINOR CURRY,

" Accepted                       *President.*

    " JOHN A. FRITZ."

The defendant was engaged in the business of manufacturing and selling saddlery and leather goods, and buying and selling other commodities, and Fritz had been engaged in a similar business for nearly forty years. Upon entering defendant's employment, Fritz familiarized himself with defendant's prices and then went on one long selling trip in Pennsylvania, and some short selling trips up to the end of

1913. Then, upon the suggestion of defendant's president, Fritz made a southern trip from February until July, 1914, and in the next few months made some short trips. In October, 1914, Fritz had an interview with defendant's president, the substance of which was sharply controverted upon the trial. According to Fritz, defendant's president Curry, said to him: "Mr. Fritz, I wish you would go out and see if you can't get some of these war orders. There is a lot of them floating around. We have a couple out, but they don't seem to be getting any business. * * * See if you can't show your salesmanship, and go out and get some of this war business that is floating around." Curry testified that about the fourth of July Fritz returned from his trip. "A few days after that I called him to my desk and I told him that he of course realized that his trip had been a failure and we could not afford to continue it. He said he was disappointed himself. ' Well,' I said, ' we cannot continue that any longer; if you wish to stay in the store and work for your salary as a clerk and help here with our local business, local trade, store work, you may do so." Curry admitted that he had "probably had some conversation with him " (Fritz) about war orders and detailed it as follows: " I had heard that the Russian Commission were in the market for a quantity of saddles. * * * I sent Mr. Fritz up to see if he could make an appointment for me to meet the Russian Commission. He went, I presume, and he returned without making an appointment. A day or two later he went again and he still did not make any appointment. After a few days I asked him if there was anything doing up there at all, and he said he was unable to handle the situation." It appeared that from this time on Fritz spent a considerable part of his time mostly in New York city and vicinity, in working up and helping to consummate war orders for the defendant and that a large number of orders, some very considerable in amount, were obtained by the defendant, in connection with which orders Fritz was actively identified. It is claimed on behalf of Fritz that he was the procuring cause of these orders and was entitled to commissions thereon at the rate specified in his contract. It was the claim of the defendant upon the trial that the contract was terminated in July, 1914, because of its unsatisfactory results; that a new

arrangement was made whereby Fritz was employed in defendant's sales office as an ordinary clerk on salary, and that thereafter no commissions were payable to him. The issue as to whether the original contract was terminated and a new one substituted for it, as claimed by the defendant, was submitted to the jury with the full acquiescence of the defendant and without any exception, and this issue was determined against the defendant. Upon this appeal it is now claimed that, irrespective of any new contract, plaintiff cannot recover the commissions sued for because they are not within the terms of the original contract. It is argued with great ability and earnestness that Fritz was employed as a traveling salesman; that his contract provided for commissions only for orders obtained while acting as a traveling salesman; that when Fritz was not traveling, defendant was entitled to his services as a clerk in its New York sales office without liability to pay commissions, and that the work done on these war orders was work that the defendant was entitled to call upon Fritz to perform when he was not traveling and was work for which he was entitled to no commissions. Without attempting to state the matter argumentatively, it will suffice to say that upon mature deliberation we are not impressed with the soundness of this construction of the contract, urged by the learned counsel for the appellant. While the contract contemplated that the immediate field of the salesman's activities should be Pennsylvania and Western New York State, it expressly provided for any other territory that might be agreed upon. It was just as competent for the parties to agree upon New York city and vicinity as it was to agree upon the trip through the Southern States. It was not Fritz's travels that the defendant was interested in or that it had agreed to pay commissions for; it was his sales. Furthermore, Fritz's war order sales, to consummate which he not only traveled about the territory embraced in the city of New York, but journeyed into Connecticut, New Jersey and Ohio, were clearly not within the provision of the contract providing for his spending " as much time as possible here in the store " when not traveling. Assuming that the defendant directed Fritz, as it was entitled to do with his consent under this contract, to go out and seek orders for the sale of its goods,

we can see no reason why the defendant should not pay the agreed commissions upon such orders as he actually procured. As long as Fritz was not working in the defendant's store when he procured or negotiated the orders, it cannot be a sufficient answer to his claim to say that the orders were not procured outside the city of New York. The motion to dismiss the complaint was, therefore, in so far as the motion was based upon defendant's interpretation of the contract, properly denied.

Under the court's charge to the jury, the law of the case is that, in order to recover the commissions claimed, the plaintiff's intestate was obliged to prove that he was the procuring cause of each contract upon which a commission was claimed. In our opinion the plaintiff wholly failed to support this burden of proof in the case of the Booth & Company contract. Assuming, as we must from the verdict of the jury, that at the time of the Booth & Company contract Fritz was still working under his original employment contract, he was required under the terms of his contract to spend as much time as possible in the defendant's New York city store when he was not traveling. He was, of course, obligated to work for the defendant while employed in the store and to perform the ordinary duties of salesman while so employed, for the defendant was obligated to pay him a salary. The contract did not provide or contemplate that the defendant should pay Fritz a commission upon sales made by him to defendant's own customers while he was working as a salesman in defendant's store, but contemplated and provided for the payment of commissions upon orders "procured" by Fritz as "procured" is ordinarily understood in connection with the work of a traveling salesman. According to the testimony of Fritz, the Booth & Company contract was obtained in the following manner: Mr. Bennett, purchasing agent for the defendant, handed Fritz a piece of paper with the name of Mr. Chandler on it, Chandler being the representative of Booth & Company. Bennett said to him, " Mr. Fritz, here is the name of a party that has *called us up two or three times,* that wants some prices on some strapping. I don't know what they are, but I can't get anybody to attend to it, and," he said, " will you attend to it? " Fritz

replied, " I certainly will, " and " went down and called on Mr. Chandler " an hour later. Booth & Company's office was at 17 Battery Place. Fritz saw Chandler and " told him I had been *sent down there* to see what was wanted." Chandler showed Fritz a sample of what was wanted, asked if the defendant could fill the order and was assured that the defendant could. Fritz asked for the same, but was told to come back and get it the following day. Fritz returned the following day for the sample but did not get it. He had a conversation on that occasion with two or three members of Booth & Company and explained to them that the defendant did not rivet its material by hand, as was done in the sample, but used a tubular rivet with a double head put in by machine, which made the work faster. The price was discussed and Chandler said that he thought possibly Booth & Company would place an order for 100,000 of the equipment in question. Chandler arranged to have Fritz call for the sample on the following day and plaintiff called as agreed. Chandler then said that he would like to meet one of the defendant's firm and, accompanied by Fritz, went to the defendant's office and was introduced to defendant's president, Mr. Curry. Chandler brought the sample with him and showed it to Curry and had a conversation with Curry about the sample. The sample was then packed up by Fritz and was sent to defendant's factory at Hartford, Conn., and came back three days later with a sample of defendant's work. Fritz took the samples to Booth & Company's office *accompanied by defendant's president,* who was there introduced by Chandler to his superior officers in Booth & Company. These officers looked the samples over, expressed themselves as pleased with defendant's job and then talked about the price with Curry. Fritz was present during the conversation but it does not appear that he took any part in it. No agreement was reached. Two or three days later Fritz called upon Chandler and asked him if he was ready to place the order. Chandler said that he was but could not give Fritz the order as he was negotiating with Curry. That ended Fritz's connection with the matter. On December 2, 1914, the order was placed with the defendant in a letter marked " Attention T. M. Curry, President," and beginning " In accordance with our telephone

conversation, we hereby authorize you to make for us up to 90,000 sets of British Standard Infantry Accoutrements providing the entire quantity is delivered by March 31st, 1915." Disregarding entirely the testimony of both Chandler and Curry, adduced by the defendant, which is strongly against plaintiff's claim, the testimony of Fritz does not show that he was the procuring cause of this contract. Weighing his testimony, even if it were sufficient *prima facie*, against the testimony of Chandler and Curry, and considering the fact that Fritz never made any claim that he was entitled to a commission for procuring this contract until two years later, a finding in favor of the plaintiff on this contract is against the weight of the evidence. It will be noted that Booth & Company were not produced to the defendant by Fritz. They had been repeatedly calling up the defendant by telephone and asking for a quotation of prices. The mere fact that Fritz went outside defendant's store to quote the prices, obtain the sample and solicit the order is a very slim basis for a claim of $20,415.57 commission, put in for the first time two years after the event. Not only did Fritz not produce the customer but he did not conduct the negotiations or effect a sale. Close questions of fact are involved in respect to several of the other orders, especially in view of plaintiff's belated claim, but the findings made with respect thereto by the jury are not against the weight of the evidence. As to this Booth & Company item, however, the proof is so palpably insufficient as to require that the judgment should be reversed and a new trial ordered, with costs to appellant to abide the event, unless within thirty days the plaintiff stipulates to reduce the verdict by deducting the commission and interest amounting to $37,539.33 upon the Booth & Company contract, in which event the judgment should be affirmed, without costs.

CLARKE, P. J., LAUGHLIN, SMITH and PAGE, JJ., concurred.

Judgment reversed and new trial ordered, with costs to appellant to abide event, unless plaintiff stipulates to reduce verdict as stated in opinion; in which event the judgment as so modified is affirmed, without costs. Order to be settled on notice.